UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                          Case Number: 1:21-cr-45-DLF

v.

ANDREW JAMES WILLIAMS,

_____/

## SENTENCING MEMORANDUM

Andrew James Williams, by and through undersigned counsel, respectfully submits his Sentencing Memorandum for consideration by this Honorable Court. The sentencing hearing is scheduled to commence on February 9, 2022.

### A. STATEMENT OF THE CASE

1. Mr. Williams is before the Court because he entered the Capitol on January 6, 2021. Although he entered the Capitol, he did not engage in any acts of violence, destruction, or vandalism. During his time in the Capitol building, Mr. Williams never saw anyone engage in acts of violence or destruction. The evidence produced in discovery shows Mr. Williams did not participate in, or even witness, any physical altercations with law enforcement. Mr. Williams used a cellular telephone to capture events inside the Capitol and communicate with others over a messaging application. According to that data, Mr. Williams entered the Capitol building at approximately 2:21 p.m., and left the Capitol building at approximately 2:44 p.m. The data confirms Mr. Williams' belief that he was in the Capitol building for approximately 20 minutes. Further, Mr. Williams purchased food near the U.S. Navy Memorial Plaza at 3:45 p.m. According to Google Maps, it takes approximately 21 minutes to walk from

where Mr. Williams exited the Capitol Building to the eatry. It would have taken significantly longer to traverse that distance because of the crowds around the Capitol and the eatery on January 6, 2021.

2. On the morning of January 11, 2021, an Orlando based news reporter sent a text message to Mr. Williams' phone, because the reporter had been told that the Federal Bureau of Investigation ("FBI") had arrested Mr. Williams.[1] Later that day, Mr. Williams retained the undersigned to resolve this case.

3. On January 12, 2021, Mr. Williams was meeting with a defense team member when FBI agents went to a family member's residence to arrest Mr. Williams.[2] Mr. Williams immediately went with the undersigned counsel to the federal courthouse in Orlando, which is one half of a mile away from the undersigned's office, and surrendered to Deputy United States Marshals ("DUSMs").[3] Dkt. 8.

4. While waiting to appear before a judge, Mr. Williams arranged for a family member meet FBI agents at Mr. Williams' residence, so the agents could use a key to unlock the door to Mr. Williams' residence and execute a search warrant.

---

[1] This Court issued a sealed complaint and arrest warrant on January 11, 2021, at 3:58 p.m. in case number 1:21-mj-30. Dkts. 1, 3 & 4.

[2] According to the discovery, agents had been aware that Mr. Williams and his family left the house on January 9, 2021. Mr. Williams, his wife, and their infant daughter had gone to live with a family member because of threats Mr. Williams and his family members had been receiving.

[3] Although a local reporter knew about the sealed arrest warrant, the DUSMs could not find any record of the warrant. The undersigned called the local FBI agent, who confirmed to DUSMs that a warrant had been issued so the DUSMs would take Mr. Williams into custody.

5.       Mr. Williams appeared in the Middle District of Florida on January 12, 2021, and waived his right to contest his arrest and was released. That same day, a two-count information was filed against Mr. Williams in this Court, which charged crimes that, combined, were punishable by up to two years. Dkt. 6.

6.       Mr. Williams appeared before this Court on January 22, 2021, and was released on his own recognizance. Dkt. 32 (Presentence Investigation Report ("PSR")) at p. 1.

7.       Since January 12, 2021, the Pretrial Services Agency of the District of Columbia and the United States Pretrial Services Office for the Middle District of Florida have supervised Mr. Williams, who has complied with all conditions of release. PSR at ¶ 12.

8.       A Superseding Information, charging Mr. Williams with a single count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), was filed on November 1, 2021. Dkt. 26.

9.       On November 2, 2021, Mr. Williams entered a plea to the Superseding Information. Dkt. 28.

**B.  MEMORANDUM OF LAW**

    **I.  Relevant 18 U.S.C. § 3553(a) Factors**

Because this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply, and therefore § 3553(a)(4) and (5) are not discussed.

**A.   § 3553(a)(1).  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

1.   <u>The Nature and Circumstances of the Offense</u>

Mr. Williams traveled to Washington, D.C. to protest certification of the results of the November, 2020 presidential election. He did not travel there with the intent to enter the Capitol Building.

Mr. Williams accepts the overall description of the events of January 6, 2021 as stated in paragraphs 13 through 19 of the PSR. As to his own role, Mr. Williams was one of those who entered the Capitol Building (PSR p. 5, ¶ 20). He entered at about 2:21 p.m. At that time, there were no barricades leading to the Capitol grounds that he could see, and the door to the Capitol Building was open, although there was a broken window next to that door. Mr. Williams entered the Capitol Crypt, then went to the entrance of the offices of the Speaker of the House (PSR p. 5 ¶ 20). He was in the Capitol Building for approximately 24 minutes. He encountered no law enforcement officers inside the Capitol Building, except those controlling foot traffic as he exited the Capitol Building. He engaged in no act of violence against any person, or of destruction or vandalism of property. Mr. Williams acknowledges that he made the statements described in paragraph 20 of the PSR. He also acknowledges that he knew that he did not have permission to enter the Capitol Building (PSR p. 5 ¶ 21).

  2.  <u>The History and Characteristics of Andrew James Williams</u>

    a.  *Family Life*

Mr. Williams is a life-long resident of Central Florida, except for the time he spent in Tallahassee, attending college. His family also resides in Central Florida.

Mr. Williams grew up in a middle class home, had, and continues to have, a good relationship with his parents, brother, and step-siblings. He was well provided for. He participated in sports in high school. There were no problems with alcohol or drug abuse in the home. Mr. Williams' parents divorced in 2008, and his mother has remarried. He sees his parents regularly, and they are very supportive. One or the other parent has attended every hearing in this case. He also gets along well with his stepfather.

Mr. Williams is married. Mrs. Williams works part time in speech therapy while she attends a state university, where she is working to obtain her master's degree in speech therapy. The marital relationship is great. Mr. and Mrs. Williams have a daughter, born on June 25, 2020, and they are expecting another child in April, 2022. Mr. Williams is a devoted family man, as described in the PSR pages 9-10, paragraphs 40 and 41. He has the strong support of his entire family.

    b.  *Educational and Professional Background*

Mr. Williams graduated from Winter Park High School in 2006. He attended Tallahassee Community College and Valencia Community College, and earned his AA in 2013. In 2013 he attended Seminole State College of Florida for training as an Emergency Medical Technician (EMT), then attended Florida State Fire College. Mr.

Williams is a licensed fire fighter, EMT, and paramedic (PSR p. 12, ¶ 57). Mr. Williams is employed full time as a firefighter and paramedic with the City of Sanford, Florida. He was placed on unpaid leave following his arrest, and remains on unpaid leave pending the outcome of this case, but remains employed (PSR p. 12 ¶¶ 58, 60). After being placed on unpaid leave, Mr. Williams obtained part-time employment as a builder. He works approximately 30 hours per week (PSR p. 12 ¶ 59).

        *c.*     *Medical Condition*

Mr. Williams is in generally good health. He is diabetic, diagnosed in 2003, for which he takes insulin (PSR p. 10 ¶ 46). He also has Attention Deficit Disorder (ADD) and used to take Adderall, but no longer takes it (PSR p. 11 ¶ 49). In 2015 he injured his anterior cruciate ligament (ACL) while playing basketball, and had surgery to repair it. There was no problem with the surgery, but his rehabilitation was lengthy-- approximately a year (PSR p. 10 ¶ 47).

The PSR reports Mr. Williams' previous marijuana use on page 11, paragraph 51. This stopped, completely, in 2015, when Mr. Williams started down the path to become a firefighter. He has found himself in this form of service to the community.

        *d.*     *Criminal History*

Mr. Williams agrees that the criminal history reported at pages 6-7, paragraphs 28-30, is accurate. All were minor offenses, one case involved municipal code violations rather than criminal offenses. No jail sentence was imposed, except the cannabis possession, where he received a sentence of 2 days time served. The most recent of these events was more than ten years ago (PSR p. 6-7, ¶¶ 38-30).

Mr. Williams has been released, under the supervision of the Pretrial Services Agency, since January, 2021. That agency has filed two reports on Mr. Williams' conduct, reporting in each that it has found no violations of any condition of pretrial release (Dkt. 21, Dkt. 25). Since first appearing in court on January 12, 2021, Mr. Williams has been supervised in a manner that is the functional equivalent of probation, and has complied fully with all conditions of release.

  B.  **The Need for the Sentence Imposed...**

    1. <u>To Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct</u>

In considering this factor, it is important to distinguish between the aggregate conduct of all the protesters and the conduct of Mr. Williams. There was a wide variety of conduct which occurred on January 6, 2021, ranging from peaceful, non-criminal protest involving pure First-Amendment speech, to acts of violence against police officers. The riot was a serious wrong; Mr. Williams' individual conduct, however, consisted only of trespass (that is, entry without permission) and making loud, rude remarks. It is essential to the goals of sentencing that those who beat law enforcement officers, broke doors and windows, and vandalized national treasures be prosecuted and punished more harshly. This is being done. As of January, 2022 the Department of Justice has prosecuted, or is in the process of prosecuting, more than 700 defendants. It does not serve the goals of 18 U.S.C. § 3553(a) for the law to treat all the protesters alike, to mete out a sentence that would, in effect, punish Mr. Williams not only for his own actions, but also for the actions of those who behaved violently.

7

Additionally, a lengthy term of probation is generally imposed for the purpose of allowing time to meet required financial obligations. In this case, Mr. Williams has agreed to pay $500 restitution, and a $10 special assessment is mandatory. Mr. Williams has provided to undersigned counsel the amount of $510 to meet this obligation. Undersigned counsel will cause these obligations to be paid in full on the day of sentencing, or as the Court otherwise directs.[4]

Considering that Mr. Williams has already spent a year under supervision, the most appropriate sentence would be time served, that is, one day in jail.  Alternatively, a sentence of not more than one year of probation would meet all these goals of sentencing.

> 2. To Protect the Public From Further Crimes of Andrew James Williams

Mr. Williams' former offenses have all been misdemeanors or petty municipal violations. He has not committed even a petty offense in more than a decade. Nothing in his background indicates that he is likely to commit a criminal offense in the future. Mr. Williams cooperated with law enforcement in the investigation of this offense. He met and talked with law enforcement, and has pleaded guilty, thus demonstrating his recognition of his own culpability and his intention to respect the law in the future. Most importantly, Mr. Williams' actions and the resulting prosecution have endangered not merely his employment, but his ability to remain employed in a job he loves, a

---

[4] The undersigned announced at the change of plea hearing that the funds were ready to be paid to the Clerk of Court. After the hearing, the Clerk's office advised the undersigned that it preferred for the judgment to be entered before accepting the funds.

vocation in which he has found himself.  He is thus highly motivated to avoid such conduct in the future.

        3.     <u>The Kinds of Sentences Available</u>

An individual convicted of an offense shall be sentenced to a term of probation, a fine, or a term of imprisonment, 18 U.S.C. § 3551(b). The incarceration range for this Class B misdemeanor is no more than six months, 40 U.S.C. § 5109(b). Probation not exceeding five years is an authorized sentence, 18 U.S.C. § 3561(a), (c)(2). A fine not exceeding $5,000 is also authorized, 18 U.S.C. § 3571(b)(6).

        4.     <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct</u>

The events of January 6, 2021 resulted in the prosecution of hundreds of defendants for a wide variety of offenses. With respect to those who have pled guilty to the offense of Parading, Demonstrating, or Picketing in a Capitol Building, this Court has sentenced a number of individuals.

On December 16, 2021, this Court, in case number 21-cr-365, sentenced Douglas K. Wangler and Bruce J. Harrison to 2 years' probation. These defendants' joint sentencing memorandum (#1:21-cr-00365-DLF; Dkt. 43) reflects that their offense conduct was similar to that of Mr. Williams; in particular, they entered the Capitol Crypt through a door that was already open, and remained only briefly.

On January 24, 2022, this Court, in case number 21-cr-548, sentenced Carey Jon Walden to 3 years' probation, including thirty days home confinement. That defendant, according to the government's sentencing memorandum (#1:21-cr-00548-DLF; Dkt. 24)

9

reflects that Waldon's conduct was more severe; in particular, Waldon, a U.S. Navy and Marine Corp veteran, brought a gas mask to Washington, D.C., and into the Capitol, entered the Capitol through a broken window; and chanted with others that the Capitol Building hid traitors. "Waldon was prepared for violence when he traveled to Washington, D.C." Govt. Sent. Memorandum, 1:21-cr-00548-DLF; Dkt. 24 at 10.

As explained below, Mr. Williams has mitigation factors that warrant a lesser sentence than those imposed upon Messrs. Wangler, Harrison, and Walden.

5.  The Need to Provide Restitution to any Victims of the Offense

The government and Mr. Williams have agreed that $500 restitution is appropriate in Mr. Williams' case. The government has requested $500 restitution in several cases related to January 6, 2021.

**II.   Other Mitigating Factors**

**A. Character Letters**

Filed contemporaneously with this Sentencing Memorandum are several letters attesting to Mr. Williams' good character. These letters come from legal, medical, and real estate professionals. Letters come from first responders, pillars of the Central Florida community, and family members. Some attest to how Mr. Williams assisted them in hard times and others discuss his volunteer work with underprivileged persons. The letters are from:

1. Michael Abufaris, D.D.S.
2. Christa Allen
3. Meg and Russell Baldwin

10

4. Michael Beaton

5. Paul Bennett, Esquire

6. Jeffrey Branham, Esquire

7. Jack Brennan, Esquire

8. Emily Crumit

9. Jackson Crumit

10. Max Crumit

11. Wendy Williams Crumit

12. William and Kimberly Daly

13. Grant Downing, Esquire

14. James Dwyer

15. Susie Emons

16. Andrew Fox

17. Rita and Howard Giordano

18. Sandra and Rick Harvon

19. Cabot Jaffee, Ph.D.

20. Cabot Jaffee, III

21. Robert and Bernice Kederick

22. Michael and Christine Kirchner

23. Frank Lovaglio

24. Sharon Maier

25. Thomas Maier

26. Kevin McClanahan

27. Gerald McGratty, Jr.

28. Joy McGratty

29. Matthew McKeever

30. Clay Patterson, Esquire

31. James and Cynthia Patterson

32. Maureen Rabazinski

33. Wanda M. Reas, Esquire

34. Ryan J. Saboff, Esquire

35. Thomas McCarthy Schoeller

36. Hon. (Retired) Stan and Mary Strickland

37. Daniel Williams

38. Matthew Williams

39. Rebecca Williams

40. Jacqui Esasky

41. R. Lee Bennett, Esquire

42. Daniel Bennett

43. James A. Fox

44. Dimitra "Jamie" Bennett

45. Hal George

46. John Ludwig

47. George Milian

48. Karis Khouri and Brian Schellhammer

49. Timothy Johnson

50. Britton Brown

51. Davey Brown

52. Brandon N. De Jesus

53. James A. Eubank

54. Johnathan Morse

55. Jonathan and Amanda Grady

56. James Slapa

57. Ryan Swetitsch

58. Todd Render

59. Ann Render

60. Brian McGratty

61. Darryl Granda

62. Henry E. Musselman, III

63. Suzie Reas

64. Keith Allo

65. Carol Corder

66. Gregory V. McGann

67. Daniel L. Bennett

The undersigned knows the Court will read the letters so they will not be summarized here. However, the undersigned wants to expand on some information

that is referenced in letters, and include additional examples of Mr. Williams' character, which are not fully addressed in the letters.

As noted in some letters, Mr. Williams participated in the Big Brother and Big Sisters program ("BBBS") until his daughter was born. In 2019, BBBS paired Mr. Williams with an 8-year-old boy whose father was incarcerated. Twice a month Mr. Williams would spend time with the boy encouraging him to work hard in school. Eventually, Mr. Williams and the boy come to an agreement – if the boy kept his grades up Mr. Williams would not use their time together to study or do homework. The boy started improving academically. During their outings, Mr. Williams and the boy would play football, go bowling, or visit the zoo or science center. Mr. Williams paid for these outings from money he earned serving the community as a firefighter, paramedic, and EMT.

### B. Life Leading Him to a Service Oriented Career

As a young man in elementary and middle schools, Mr. Williams and his mother worked with volunteers at a homeless shelter once a month. Mr. Williams would help in the kitchen and serve meals to hundreds of the homeless. While Mr. Williams applied himself to his studies in high school and in community college, academic pursuits did not suit his service-oriented personality. Ultimately, he found his way to serving his community as a firefighter, paramedic and emergency medical technician. Each ambulance has two firefighters, one serving as an EMT who is primarily responsible for driving the ambulance and the other serving as a paramedic in charge of the patient's care. EMTs can only perform basic life support and non-invasive care, which includes

performing cardiopulmonary resuscitation, giving oxygen, applying splints, etc. Only paramedics can perform advanced life support, which includes intubating a patient, administering intravenous medicine, performing a tracheotomy, inject drugs, etc.

When Mr. Williams started to pursue his career, he would test with sometimes 300 other people who were competing for two available positions. Eventually, Mr. Williams volunteered with the City of Apopka Fire Department in hopes that he would be hired as a firefighter and EMT. After 6 months, Mr. Williams tore his ACL playing basketball. While working through the year-long rehabilitation program after surgery, Mr. Williams went to paramedic school and passed his National License exam on the first attempt. Shortly thereafter, in October 2016, Mr. Williams was hired as a full-time firefighter and paramedic at the City of Sanford Fire Department ("SFD").

Mr. Williams was the first insulin dependent diabetic in SFD. At any moment, the alarm could sound, and Mr. Williams would have to respond regardless of his blood glucose levels. This required Mr. Williams to be incredibly disciplined with his blood sugar levels during 24-hour shifts. Despite serving as the sole paramedic during his first year with SFD, Mr. Williams worked hard and obtained his driver and engineer rank before starting his second year of service. This rank permitted Mr. Williams to drive the fire engine and pump water from the engine to the firefighters battling blazes.

The station where Mr. Williams works generally serves an underprivileged population and has an average of 10 calls for service per shift. Mr. Williams tends to 10 people, or groups of people, who are uniquely having terrible events in their lives. But Mr. Williams treats them all with empathy and compassion while providing medical

attention as if each call for service is the first one of his shift. During the four years that Mr. Williams served at the SFD, he has saved a dying woman on the side of the road who was in anaphylactic shock, and comforted a 10-year-old boy who was run over by a truck, resulting in severe head and brain trauma.

In addition, Mr. Williams has used his type-1 diabetes struggle to relate to patients and give them and their family members education, guidance, and tips on managing their lifelong battles with diabetes. Mr. Williams routinely wrote on note cards simple ways patients could improve their daily struggle with diabetes. These patients in underprivileged areas are often without access to adequate medical care.

Serving as a firefighter, paramedic, and EMT, like all public service, is a privilege that does not lend itself to ever being not available to help. What follows are but two examples.

One morning after finishing a 24-hour shift, Mr. Williams drove to his mother's house. On the way he saw a small sports utility vehicle flip through the air, causing the front and back ends of the SUV to collapse. Using his personal car, Mr. Williams instinctively blocked traffic, and instructed a passerby to call 9-1-1. He cut the side airbag away to find an elderly woman in the driver's seat who was injured and dazed from the impact. Her steering wheel airbag failed to deploy on impact. Knowing the airbag could deploy with explosive force at any second, Mr. Williams got the driver out of her car and provided medical attention until local first responders arrived. The driver knew Mr. Williams because he used to mow her lawn for spare change in high school. She was able to track him down, and cried as she thanked him for helping her.

Another example of Mr. Williams' service to the community happened one Saturday at a local park, where Mr. Williams and a friend, a medical doctor, planned to kayak. A group of people were using a rope swing, tied to a tree, to jump into the water. As a man swung forward, his feet hit the ground, causing him to lose his grip. His face landed on exposed tree routes, causing his neck to snap in front of adults and children who were enjoying the park. The unconscious man started snoring respiration, a sign Mr. Williams knew meant the man needed immediate emergency medical attention or he would die. Mr. Williams directed someone to call 9-1-1 while he held the man's head and neck in such a way to decrease his chance of being paralyzed. Twenty minutes later, local emergency services personnel arrived. Mr. Williams could tell the medic was new, so Mr. Williams coached him on administering care to the man. Eventually emergency services transported the man to a local hospital.

None of these acts of service are brought to the Court's attention to excuse Mr. Williams' actions on January 6, 2021. However, these can, and should, serve as a basis to sentence Mr. Williams to time-served. A term of probation will not further deter Mr. Williams after he has served one year under the supervision of pretrial services, which is akin to probation. Further, a term of probation might affect his ability to return to duty as a firefighter, emergency medical technician, and paramedic, duties for which he has repeatedly demonstrated exceptionally and unswerving dedication.

C. <u>CONCLUSION</u>

A sentence of time served, with $500 restitution and the mandatory $10 special assessment, would constitute a sentence "sufficient, but not greater than necessary to accomplish the goals of sentencing." Mr. Williams requests that the court impose this sentence. Alternatively, a sentence of not more than 12 months' probation would be sufficient.

Respectfully submitted on January 28, 2022.

        **LAW OFFICES OF**
        **HORWITZ & CITRO, P.A.**

        *s/Vincent A. Citro*
        **VINCENT A. CITRO**
        District of Columbia Bar Number: 1531364
        U.S. District Court Bar Number: FL0021
        vince@horwitzcitrolaw.com
        17 East Pine Street
        Orlando, Florida 32801
        Telephone: (407) 843-7733
        Facsimile: (407) 849-1321
        Attorney for Andrew James Williams

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 28, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to Peter C. Lallas, Assistant United States Attorney, at Peter.Lallas@usdoj.gov.

*s/Vincent A. Citro*
**VINCENT A. CITRO**
District of Columbia Bar Number: 1531364
U.S. District Court Bar Number: FL0021